1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   DAVID DUNN,                           No. CIV S-09-3169-CMK

12              Plaintiff,

13        vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Docs. 15 & 16) and defendant's

23   cross-motion for summary judgment (Doc. 17).

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on December 8, 2006.  In the application, plaintiff claims that disability began on March 12, 2002.[1]  Plaintiff claims that disability is caused by dysthymic disorder causing difficulty getting along with others, stress, and poor concentration.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 4, 2008, before Administrative Law Judge ("ALJ") Thomas P. Tielens.   In a February 4, 2009, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant had the following severe impairments through the date last insured: a history of rotator cuff injury and a dysthymic disorder;

2. Claimant's impairments did not meet or medically equal an impairment listed in the regulations;

3. Through the date last insured (June 30, 2004), the claimant had the residual functional capacity to perform light work except for the work that does not require frequent use of the right upper extremity for pushing/pulling or overhead work, or any public interaction, and requires only limited interaction with co-workers, and is slow paced or allows the claimant to control his pace; and

4. Based on claimant's age, education, work experience, residual functional capacity, and testimony from a vocational expert, there were jobs that existed in significant numbers in the national economy the claimant could have performed.

After the Appeals Council declined review, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1]	Plaintiff filed a prior application in August 2000 which was denied without appeal on March 12, 2002.  Thus, a presumption of continuing non-disability arises which plaintiff must rebut with evidence of changed circumstances showing greater impairment after that date.  See Chavez v. Bowen, 844 F.2d 691 (9th Cir. 1088).

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

February 9, 2000 – The Department of Veterans Affairs ("VA") issued a disability rating decision.  The decision was based on a VA examination conducted in October 1999, treatment reports for the period June 1998 through October 1999, and reports from previous employers.  Plaintiff's dysthymic order was rated as 70% disabling.  The rating decision specifically states: "A higher evaluation of 100 percent is not warranted unless there is total occupational and social impairment. . . ."[2]  Plaintiff was rated 10% disabled each for hypertension and vascular/tension headaches.[3]

January 16, 2002 – VA Clinic progress notes indicate that plaintiff complained of difficulties with finances, sleeplessness, poor mood, and nightmares.  Objectively, the doctor noted some psychomotor retardation.  The doctor also noted that plaintiff's answers were spontaneous, logical, and goal-directed.  Insight was fair and judgment was intact.  The doctor assigned a GAF score of 45.

February 20, 2002 – Plaintiff reported to the VA Clinic that he had hopes his financial situation was about to improve and that this had improved his mood.

March 12, 2002 – Prior application for social security benefits denied without appeal, giving rise to presumption of continuing non-disability.

April 16, 2002 – VA Clinic notes reflect that plaintiff reported a gloomy mood due to recent denial of his social security claim.  At this time, plaintiff was assigned a GAF score of 55.

---

[2]    Thus, even in 2000, the VA believed that plaintiff's dysthymic disorder was not totally disabling in terms of plaintiff's ability to pursue occupational activities.

[3]    At the administrative hearing, plaintiff testified that he receives about $2,500 per month from the VA.

April 25, 2002 – Plaintiff reported to the VA Clinic an overall improvement in mood.

May 29, 2002 – Progress notes from the VA Clinic reflect that plaintiff was complaining of side effects of new medication, specifically headaches.

May 30, 2002 – Progress notes from the VA Clinic indicate that plaintiff reported being more active. He also stated he was getting along better with his wife. Objectively, plaintiff's speech was normal, there was no evidence of psychotic symptoms, and memory and cognition were intact. The note concluded by noting that plaintiff's mood was improving, "especially since medication change."

June 13, 2002 – VA Clinic progress notes indicate that plaintiff was functioning better than before and that he was considering finding a job. Plaintiff reported increased activity.

June 26, 2002 – VA Clinic progress notes indicate that plaintiff reported increased irritability and edginess. He noticed the increase since discontinuing the medication that had been causing headaches as a side effect. The doctor started plaintiff on a different medication.

July 30, 2002 – VA Clinic progress notes show that plaintiff was working with his vocational counselor on finding a job, but that plaintiff was concerned that he was "not ready" and feared being fired. Plaintiff reported that sleep was not refreshing. Medication was changed to address complaints of insomnia.

October 2, 2002 – Plaintiff reported to the VA Clinic that his headaches had resolved and that nightmares had decreased. A progress note shows that plaintiff was compliant with medication regimen, which had been undergoing change to address side effects such as insomnia and headaches. Plaintiff also reported increased anger control.

November 12, 2002 – VA Clinic progress notes indicate that plaintiff reported with complaints related to his right shoulder. Plaintiff attributed the pain to repetitive motion and denied any recent trauma or injury. On objective evaluation, the doctor noted psychomotor retardation and that plaintiff required prompting to answer questions. Medication was continued.

1    December 17, 2002 – Plaintiff reported to the VA Clinic to follow up on his

2  treatment.  He reported a "major improvement" in his sleep, which plaintiff now reported to be

3  refreshing.  While plaintiff reported some problems with concentration, he stated that he was

4  planning to attend college in the spring.

5    February 3, 2003 – Plaintiff reported to the VA Clinic with his wife in apparent

6  mental health crisis.  He reported: "I feel overwhelmed and don't know why I'm crying all the

7  time and feel depressed."  Objectively, plaintiff presented as tremulous and somewhat hysterical.

8  The doctor noted that as soon as plaintiff's wife left the room, plaintiff became clear and

9  articulate and tremors subsided.  The doctor opined that plaintiff's wife was the focal point of his

10 distress.

11    February 18, 2003 – VA Clinic progress notes reflect the following subjective

12 complaints:

13           David went through a rough time recently when he was hit with several
             negative events.  First, his wife required shoulder surgery and this meant
14           that David had to take over where she left off and he was caring for their
             special needs child.  Additionally, his mother was severely ill back East
15           and he was unable to visit her.  All along, David was enrolled in classes at
             a nearby college and was finding the course work overwhelming so he
16           dropped out.  Then there is the usual marital distress added in. . . .

17 The doctor noted suicidal ideation.  The doctor also noted that, according to plaintiff, the

18 situation gradually improved and so did his mood.  Plaintiff was prescribed Klonopin for

19 breakthrough anxiety.

20    April 23, 2003 – Progress notes from the VA Clinic indicate that plaintiff was

21 seen for medication management.  Subjectively, plaintiff reported continuing difficulty dealing

22 with his wife, and that he also dropped out of college due to difficulties with memory and

23 concentration.  Objectively, plaintiff's mood was dysphoric and bland.   The doctor decided to

24 taper plaintiff's dosage of Trazodone, continue Depakote and Paxil at the same dosages, and

25 continue Clonidine at night.  Plaintiff was assigned a GAF score of 55.

26 / / /

May 9, 2003 – VA Clinic records indicate that plaintiff moved to Kentucky and answered a number of mental health questions upon transferring his care there.  Specifically, he stated that he had not been bothered by "feeling down or depressed" during the past month.  He also stated that, during the past month, he had not been bothered by lack of interest in activities.

June 24, 2003 – VA Clinic records indicate that plaintiff reported to the triage area for refill of medications.  As part of this process, he answered some questions concerning his mental health.  His answers were the same as those given on May 9, 2003.

November 3, 2003 – VA Clinic records indicate that plaintiff underwent a psychiatric examination.  Plaintiff reported depression, poor sleep, and poor appetite.  Plaintiff also told the doctor that he had been hospitalized several times in the past for depression and suicide attempts.  Plaintiff also reported periods of mania.  Objectively, the doctor noted fair eye contact, a dysphoric mood, and constricted affect.  Cognitive functions were intact and there was no overt psychosis.  The doctor diagnosed bipolar disorder and assigned a GAF score of 55.

January 20, 2004 – VA Clinic records reveal that plaintiff answered psychological screening questions.  He reported no depression or lack of interest in the past month.

January 30, 2004 – VA Clinic records include a detailed clinical assessment by plaintiff's therapist.  The therapist offered the following observations:

> Mr. Dunn was neatly and casually dressed and appeared his stated age of 39 years.  He was alert and oriented.  Some anxiety was observed in that his hands were shaking (the patient indicated that this was due to nervousness in general and because of the interview).  The patient's psychomotor activity appeared mildly slowed and his voice was soft-spoken.  Mr. Dunn's reported mood was "better today," and he reported that his mood is usually "down" and "blue."  His affect was constricted and consistent with the content of the session, and his eye contact was appropriate.  His thought process was fairly logical and goal-directed, but appeared mildly slowed, perhaps because of depression, as he forgot what he was talking about two different times.  No psychosis or delusions were observed.  Intellectual functioning and insight appear to be fair. . . .

Plaintiff denied manic episodes.

/ / /

6

1    VA Clinic records also contain an assessment prepared by a psychologist

2  following a series of psychological tests administered earlier on January 20, 2004.  The doctor

3  summarized the objective data as follows:

> Results of the TSI [Trauma Symptom Inventory] indicate that Mr. Dunn's
> response pattern is similar to that of individuals who have long-standing
> dysthymia or a depressive personality style.  His responses suggest that he
> has interpersonal or attachment-related issues which are closely linked
> with his dysthymia. . . .
>
> Results of the MMPI-2 suggest that Mr. Dunn is likely to be experiencing
> significant emotional turmoil, including feelings of anxiety, fearfulness,
> pessimism, and hopelessness.  People with similar profiles are more likely
> than others to have histories of being sexually abused.  Individuals with
> profiles similar to Mr. Dunn's often lead rather schizoid lifestyles in which
> they lack basic social skills and are shy, withdrawn, introverted, and
> socially isolated. . . .
>
> Results of the RISB [Rotter Incomplete Sentences Blank] suggest that Mr.
> Dunn struggles with typical depressive symptoms including hopelessness,
> poor concentration, and low motivation. . . .

The doctor diagnosed dysthymic disorder and assigned a GAF score of 50.

    March 15, 2004 – VA Clinic notes reflect the following treatment assessment:

> Mr. Dunn appears very comfortable with the therapy process.  He reported
> that regular sessions are extremely helpful to him in coping with his
> depressive symptoms and other distress.

    April 21, 2004 – VA Clinic records indicate that plaintiff was responding

positively to individual therapy and that plaintiff "appeared almost euthymic compared to his

usual presentation, a positive change from previous sessions."  Plaintiff reported that he was

benefitting from therapy.

    April 23, 2004 – Plaintiff reported to the VA Clinic that he was "handling things

well."  Objectively, plaintiff's speech was well-articulated and his thoughts were focused without

loose associations.  Plaintiff's activity level was normal, mood and affect were stable and

appropriate, and plaintiff's insight and judgement was "fair/good."

/ / /

/ / /

1        May 19, 2004 – Plaintiff reported to the VA Clinic that his mood was "pretty

2    good."  The therapist noted that plaintiff smiled frequently during the session, noting that things

3    are going much better for him.  The therapist assessed the effectiveness of therapeutic treatment

4    as "positive."

5        June 24, 2004 – VA Clinic record reflect the following assessment:

6        Mr. Dunn appeared less dysthymic and more cheerful than usual this
     session.  He seems to be improving in terms of managing daily life
7    stressors, and he appears to be coping effectively with his depressive
     symptoms. . . .
8

9    The therapist assessed plaintiff's progress as "positive."

10       July 30, 2004 – Plaintiff reported to the VA Clinic that he was doing well.  At his

11   therapy session he made good eye contact and appeared to be in no distress.  His activity level

12   was normal and his mood was stable.  He also reported that he was walking more and staying

13   busy.

14       This is also the date plaintiff was last insured for benefits.[4]

15       August 5, 2004 – Medical staff at the VA Clinic recommended that plaintiff's

16   therapy sessions be terminated "per patient and clinician agreement."  Specifically, the therapist

17   reported:

18       Mr. Dunn appeared euthymic and even cheerful this session, a marked
     change from his presentation during most of his previous sessions.  He
19   seems to be managing his daily life stressors more effectively and coping
     well with his depressive tendencies. . . .
20

21   Subjectively, plaintiff reported no mood problems, sleep problems, appetite problems, nor any

22   difficulty accomplishing daily tasks.

23   / / /

24

25       [4]    Though this is the date plaintiff was last insured for benefits, the court
     summarizes records after this date in order to outline the complete longitudinal history of the
26   medical evidence of record.

8

1        <u>March 2, 2005</u> – VA Clinic records reflect that, by this time, plaintiff's psychiatric

2    medications were being gradually reduced in dosage.

3        <u>March 15, 2005</u> – VA Clinic records reflect that plaintiff was complaining of

4    fatigue during the day and an inability to sleep at night since running out of Paroxetine.

5        <u>August 30, 2005</u> – VA Clinic progress notes indicate that plaintiff was feeling

6    "good most of the time" and that he believed a recent increase in Depakote had helped.  On

7    objective examination, the doctor noted that insight and judgment were "fair/good," plaintiff's

8    activity level was "normal," and his mood and affect were stable and appropriate.

9        <u>January 11, 2006</u> – VA Clinic progress notes reflect that plaintiff was not

10   complaining of any problems.  He admitted feeling better, and denied any problems with

11   medication.  Objectively, plaintiff's activity level was normal, no current stressors were

12   identified, sleep was good, as were insight and judgment.

13       <u>April 7, 2006</u> – VA Clinic progress notes show that plaintiff reported feeling

14   stable most of the time.  He also denied any side effects of medication.  Objectively, activity

15   level was good, mood/affect was stable and appropriate, and sleep/appetite was fair to good.

16       <u>October 17, 2006</u> – VA Clinic progress notes reflect the following history:

17       SUBJECTIVE: Pt was referred for medication evaluation by his PCP, Dr.
     Lazarus.  Mr. Dunn had moved back to this area from Kentucky this past
18   July.  He was receiving psychiatric medications there but had limited
     counseling.  He temporarily received counseling services from an intern.
19   The pt explains that his mood and anxiety symptoms are intermittent and
     situation dependent.  His baseline is well managed.  He traces most of his
20   symptoms to the relationship he has with his wife and his concern over
     their finances.  He denies there is much conflict between them as he
21   generally concedes to her and has learned to "tune her out."  The two
     recently remarried for the third time in what the pt describes as a marriage
22   of necessity.  Even at this time he is considering moving back to KY while
     remaining married. . . .
23

24   The chart notes also indicate that plaintiff complained of "boredom when he is not caring for his

25   daughter."  The doctor noted that plaintiff was exercising and that plaintiff found "the

26   medications helpful at their current dosages and denies side effects."  Objectively, plaintiff's

1   mood was mildly dysphoric.  The doctor concluded the note with the following: "PLAN: No

2   follow up planned with this provider.  Medication regimen is sufficient for pt's current needs.

3   Maintain present dosages. . . ."

4           January 5, 2007 – Plaintiff's wife, Evelyn Dunn, submitted a third-party function

5   report.  Mrs. Dunn stated that plaintiff cares for family pets and does not require any help to

6   complete this task.  She stated that, due to plaintiff's impairments, he can no longer perform auto

7   maintenance, household repairs, or yard work.  She stated that plaintiff has no problems with

8   personal care, but that he needs reminders to bathe and take care of his teeth.  Mrs. Dunn also

9   stated that plaintiff needs constant reminders to take his medication.  Mrs. Dunn stated that

10   plaintiff does his own laundry and will vacuum once a week, though he needs to be reminded

11   constantly to do his laundry.  She added that plaintiff goes out several times a day, either on foot

12   or by car, and that he can go out alone.  She stated that plaintiff goes grocery shopping on his

13   own three or four times a month, though it "takes him forever."  Mrs. Dunn stated that plaintiff

14   cannot handle money at all because "he does not know how to budget his money. . . ."  Mrs.

15   Dunn stated that plaintiff has problems interacting with family or others "due to his mentality and

16   stress."

17           As to abilities, while Mrs. Dunn stated that plaintiff's impairments cause him

18   difficulty with every strength activity (i.e., walking, lifting, reaching), she also stated that he can

19   lift up to 50 pounds and walk about two miles.  She added that his attention span is short though

20   he does well with spoken instructions.  Finally, Mrs. Dunn stated that plaintiff requires use of a

21   prescribed C-PAP machine for sleep apnea.

22           January 8, 2007 – Plaintiff submitted a function report as part of his current

23   application.  As to his typical day, plaintiff stated that he will get up, eat breakfast, take a shower,

24   brush his teeth, run some errands, go to medical appointments, and watch television.  He stated

25   that he cares for the family pets and does this without assistance.  He stated that, due to his

26   impairments, he has trouble going to sleep and sleeping through the night.  He reported no

problems with personal care, though he needs occasional reminders to groom regularly.  He also stated that he needs reminders to take medication.  Plaintiff stated that he cannot prepare his own meals.

As to abilities, plaintiff stated that he can usually follow written instructions well unless they are "really complex."  He stated that he does not follow spoken instructions well due to lack of understanding.

May 17, 2007 – VA Clinic progress notes reflect that, by this time, plaintiff was feeling more depressed for the past several weeks.  He reported that he was going through "yet another divorce."  Objectively, the doctor noted good compliance with medication, no reported side effects, and a stable mood.

June 19, 2007 – Plaintiff reported to the VA Clinic that he had been active recently and had been doing yard work.  He also reported as a side effect difficulty staying awake during the day.  Objectively, the doctor noted good compliance with medication, no reported side effects, and a stable mood.   The doctor tried decreasing the dosage of Trazodone to relieve plaintiff's feeling of sedation.

July 13, 2007 – Agency consultative psychiatrist K.J. Loomis, M.D., prepared a psychiatric technique review form and accompanying function assessment.  The doctor found insufficient evidence of a medically determinable impairment existing between March 2002 and June 2004.

August 29, 2007 – VA Clinic progress notes indicate that, subjectively, plaintiff reported that his anger is well managed but he is often depressed.  Objectively, the doctor noted good compliance with medication, decreased anger and nightmares, but sedation as a side effect. The doctor increased the dosage of Paxil and added Ambien.  Plaintiff was assigned a GAF score of 59.

/ / /

/ / /

1     October 30, 2007 – VA Clinic notes reflect that plaintiff reported better sleep and

2     more motivation to be active.  He also stated that his anger was well-controlled.  Plaintiff stated

3     that he stopped Ambien due to feelings of worsening insomnia.  Objectively, the doctor noted

4     good medication compliance, decreased anger and nightmares, but symptoms of insomnia as a

5     possible side effect of medication.

6     November 30, 2007 – VA Clinic progress notes indicate that plaintiff reported

7     continuing financial problems related to his divorce.  He also reported a custody battle.  While

8     plaintiff reported continuing irritability, he stated that this was better than before and he was

9     thinking about finding work.  Objectively, the doctor observed an anxious mood though he noted

10    that plaintiff also had an "appropriate and reactive affect."

11    January 8, 2008 – Subjectively, plaintiff reported to the VA Clinic that his mood

12    was good and his irritability was low.  He told the doctor that his divorce was over and the

13    settlement was acceptable to him.  Objectively, the doctor noted that plaintiff was somewhat

14    withdrawn and that his mood was euthymic.  The doctor ended the note, however, by

15    commenting that plaintiff "is stable with good mood and tolerating meds."  Plaintiff was

16    assigned a GAF score of 65.

17    May 28, 2008 – Plaintiff reported to the VA Clinic that he had been more active

18    "with some part-time work."

19

20                              **III.  STANDARD OF REVIEW**

21    The court reviews the Commissioner's final decision to determine whether it is:

22    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

23    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

24    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

25    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

26    support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

12

1   including both the evidence that supports and detracts from the Commissioner's conclusion, must

2   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

3   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

4   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

5   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

6   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

7   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

8   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

9   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

10  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

11  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

12  Cir. 1988).

13

14                                    **IV.  DISCUSSION**

15          In his motion for summary judgment, plaintiff argues: (1) the ALJ incorrectly

16  interpreted plaintiff's January 2004 psychological test results; (2) the ALJ's residual functional

17  capacity finding is not supported by evidence of plaintiff's daily activities; and (3) the ALJ failed

18  to properly consider Veterans Administration ratings.[5]  Plaintiff seeks a remand "for a

19  determination if there has been 'substantial improvement' in the plaintiff's medical condition, as

20  they would relate to his functional capacity to perform 'substantial gainful activity'. . . ."

21  / / /

22  / / /

23  ─────────────────────

24          [5]      Plaintiff also appears to argue that the principle of administrative res judicata
    "clearly cannot be applied to the period of time that was not adjudicated in the prior claim."  This
    argument, however, is confusing given the following to which plaintiff agrees: (1) plaintiff's date

25  last insured is June 30, 2004; and (2) the relevant time period is March 12, 2002 (the date of the
    prior decision), through June 30, 2004 (the date last insured).  Plaintiff also states that he is not

26  "attempting to 'invade' the prior adjudication. . . ."

                                        13

A.    **January 2004 Psychological Testing**

Regarding this report, the ALJ stated:

> In January 2004, the claimant underwent a two-hour mental health evaluation, at which time he reported nightmares related to abuse as a child, and anger and other emotions associated with his impending divorce.  After a team of mental health professionals reviewed the evaluation, the claimant was advised that he has dysthymia.  Post traumatic stress disorder and bipolar disorder, which had been provisionally diagnosed previously, were specifically ruled out.  The claimant's GAF . . . was 50, which reflects moderately serious symptoms. The claimant reported the following physical impairments: hypertension, hip pain, and a hernia.
>
> The undersigned notes that the claimant did not complain of shoulder pain during the January 2004 [evaluation], nor did he complain of significant shoulder pain at any other time during the period in question.  Exhibit 9F/234-245.
>
> In light of the claimant's variable symptoms during the period at issue, the undersigned relies on this report because it takes into account episodes when the claimant reported a mental health crisis, as well as period when the claimant reported relative stability.  In addition, the report contains findings upon mental status examination as well as formal psychological testing, and there are numerous references to the claimant's physical health.

Plaintiff argues that the ALJ mischaracterized the meaning of a GAF score of 50 when discussing the report.  Plaintiff challenges the ALJ's statement that a GAF score of 50 "reflects moderately serious symptoms."  In particular, plaintiff argues:

> I believe that this is an incorrect statement of the significance of a GAF score of 50.  The *Diagnostic and Statistical Manual of Mental Disorders,* 4th Edition, Text Revision most often referred to as the DSM-IV-TR sets forth its Global Assessment of Functioning on page 34 in the paperback edition I have access to.  The GAF scores are given in ranges. For example scores in the range of 41 to 50 indicate "serious" symptoms, while scores in the range of 51-60 indicate moderate symptoms.  Granted a GAF score of 50 is at the top of the range for "serious symptoms," but it is not correct to indicate that the plaintiff's [GAF score of 50] reflect "moderately serious symptoms."

/ / /

/ / /

/ / /

1    This argument is not persuasive.  According to plaintiff, scores in the 41-50 range

2  indicate "serious" symptoms and scores of 51-60 indicate "moderate" symptoms.  By

3  characterizing plaintiff's GAF score of 50 as indicating "moderately serious" symptoms, the ALJ

4  correctly identified plaintiff's score as reflecting symptoms which were somewhere between

5  serious and moderate in severity.  Plaintiff recognizes as much by acknowledging that a score of

6  50 is on the borderline between the two score ranges.

7    **B.**    **Plaintiff's Daily Activities**

8    The ALJ discussed plaintiff's daily activities as part of a larger discussion of

9  plaintiff's residual functional capacity.  In particular, the ALJ discussed plaintiff's testimony of

10  disabling symptoms:

> At the hearing, the claimant testified that he moved to Kentucky and lived there throughout the period at issue in this case.  While in Kentucky, he lived with his wife until she left him, then he lived with his brother, then a girlfriend, then by himself.  The claimant testified that he currently lives with two roommates and does not have any difficulty getting along with them.
>
> The claimant testified that he attempted vocational rehabilitation during the period at issue but he was not successful because he was overwhelmed and could not get along with others.  The claimant's testimony revealed that he is able to engage in a wide range of daily activities.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  The claimant has received treatment for numerous physical complaints, as well as ongoing mental health complaints, and he has been generally stable with treatment.  There is a clear relationship in the treatment records between the claimant's mood and his marital status, with three marriages and three divorces with the same woman being the focus of his symptoms and treatments.  The claimant's activities of daily living are not limited, and there is no evidence that he has difficulty getting along with the numerous medical professionals who have treated him over the many years he has been treated at the VA and other medical facilities.  The claimant lives with roommates, which establishes that he is able to get along with others.

/ / /

15

1    In claiming that the ALJ committed error, plaintiff argues that the ALJ failed to specify which of

2    plaintiff's daily activities were consistent with the residual functional capacity finding, and that

3    the ALJ failed to specify how any such activities were accurate predictors of plaintiff's ability to

4    perform in the workplace.  Thus, plaintiff's argument is, in essence, that the ALJ failed to

5    correctly assess the credibility of plaintiff's testimony that his symptoms are totally disabling.

6        The Commissioner determines whether a disability applicant is credible, and the

7    court defers to the Commissioner's discretion if the Commissioner used the proper process and

8    provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

9    credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

10    F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

11    821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

12    and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

13    evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

14    credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

15    1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

16    and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

17        If there is objective medical evidence of an underlying impairment, the

18    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

19    because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

20    341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

21       The claimant need not produce objective medical evidence of the
      [symptom] itself, or the severity thereof.  Nor must the claimant produce

22       objective medical evidence of the causal relationship between the
      medically determinable impairment and the symptom.  By requiring that

23       the medical impairment "could reasonably be expected to produce" pain or
      another symptom, the Cotton test requires only that the causal relationship

24       be a reasonable inference, not a medically proven phenomenon.

25       80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
      Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

26

1    The Commissioner may, however, consider the nature of the symptoms alleged,

2    including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

3    947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

4    claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

5    testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow

6    a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

7    (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

8    Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

9    claimant cooperated during physical examinations or provided conflicting statements concerning

10   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

11   claimant testifies as to symptoms greater than would normally be produced by a given

12   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

13   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

14   Regarding reliance on a claimant's daily activities to find testimony of disabling

15   pain not credible, the Social Security Act does not require that disability claimants be utterly

16   incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

17   repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

18   does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

19   Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

20   Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

21   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

22   restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

23   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

24   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

25   activities are not easily transferable to what may be the more grueling environment of the

26   workplace, where it might be impossible to periodically rest or take medication").  Daily

17

1    activities must be such that they show that the claimant is ". . .able to spend a substantial part of

2    his day engaged in pursuits involving the performance of physical functions that are transferable

3    to a work setting." Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

4    before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

5    Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

6                Plaintiff argues that the ALJ's statement that his testimony revealed an ability to

7    engage in a wide range of daily activities "is not sufficient as a matter of law."  Plaintiff adds:

8                     . . .The ALJ is required to be specific when setting forth the
                 reasons why he concluded that the plaintiff's daily activities implies an
9                ability to perform work for 8 hours per day, 5 days per week on a regular
                 and consistent basis.  What activities of daily living did the ALJ rely upon
10               in concluding that these activities persuaded him that the claimant was
                 able to perform "substantial gainful activity?"  The failure to articulate
11               what activities he relied upon, deprives the plaintiff of having a reviewing
                 court determine whether the basis of the ALJ's rejection of his testimony
12               was justified or not. . . .

13   Plaintiff cites Bunnell v. Sullivan, in which the court held that the ALJ's factual findings must be

14   "sufficiently specific" to allow a reviewing court to determine whether the rejection of plaintiff's

15   testimony was based on proper grounds or was arbitrary.  947 F.2d 341 (9th Cir. 1991).

16   According to plaintiff, the ALJ's analysis is flawed because: (1) the ALJ failed to specify how

17   plaintiff's daily activities were inconsistent with his testimony; and (2) the ALJ failed to show

18   how plaintiff's daily activities predict his ability to perform substantial gainful activity on a

19   sustained basis.

20               At the outset, the court observes that the ALJ did not rely solely on evidence of

21   plaintiff's daily activities as a basis to discredit his testimony.  In this case, plaintiff claims

22   disability based on dysthymic disorder causing difficulty getting along with others, stress, and

23   poor concentration.  In addition to daily activities, the ALJ cited evidence that plaintiff's

24   complaints were alleviated with medication and treatment (and worsened with non-compliance

25   with medication), as well as evidence that plaintiff's mood problems are directly related to his

26   marital situation, with three marriages and divorces involving the same woman as the focus of

1   his symptoms.  These are independently valid reasons to reject plaintiff's credibility and plaintiff

2   does not argue otherwise.

3           Additionally, even had the ALJ relied only on evidence of plaintiff's daily

4   activities to reach an adverse credibility finding, the court finds no error.  Here, plaintiff testified

5   that he was unable to work due to being overwhelmed with work and an inability to get along

6   with others.  Significantly, plaintiff does not complain of disabling pain.  Citing Orn, plaintiff

7   concludes that the ALJ erred because specific reasons were not set out linking plaintiff's daily

8   activities to an ability to spend a substantial part of the day performing work-related tasks.

9   Plaintiff acknowledges, however, that a claimant's daily activities may serve as a basis to

10  discredit testimony where such activities contradict the testimony.  Such is the case here.

11  Specifically, plaintiff testified that he could not perform any work due to difficulty concentrating,

12  difficulty getting along with others, and other psychological symptoms including feelings of

13  being overwhelmed.  His daily activities contradict at least part of this testimony in that he lives

14  with roommates which indicates an ability to get along with others.[6]

15          This case is not the kind of case where the Fair line of cases requires that daily

16  activities bear a nexus to the claimant's ability to perform work activities on a sustained basis.

17  Such a case would involve testimony of disabling pain, in which event the ALJ would be

18  required to make findings that show that the claimant is not simply engaging in some daily

19  activities despite pain (i.e., for therapeutic reasons), but that the claimant's daily activities

20  demonstrate an ability to perform substantial gainful work activity.  Here, the court notes once

21  again that plaintiff has never claimed disability due to pain.

22  / / /

23  / / /

24  ───────────────

25      [6]      In any event, plaintiff claims that his dysthymic disorder causes a difficulty getting
        along with others.  The ALJ's residual functional capacity assessment accounts for this difficulty
        in that the ALJ limited plaintiff to work that did not require any public interaction and only
26  limited interaction with co-workers.

C.    **Veterans Administration Ratings**

Regarding the VA ratings, the ALJ stated:

The undersigned has considered the Veterans Administration rating decision dated February 9, 2000.  Exhibit 11E.  As noted above, changes in case law since the March 12, 2002, hearing decision was issued require that great weight be given to such evidence, unless there are specific reasons for giving the evidence less weight or no weight.  *McCarthy v. Massanari*, 298 F.3d 1072 (9th Cir. 2002).  The undersigned notes that the VA rating decision is dated more than two years prior to the period at issue in this case.  Nevertheless, giving the claimant the full benefit of the doubt that the report is material to the current evaluation, the undersigned makes the following observations:

1.  The treatment notes contemporaneous to the report reveal that the claimant is much less impaired than indicated in the rating decision.  Specifically, there is no evidence of psychotic hallucinations, suicidal ideation, or feelings of persecution, as indicated in the rating decision as a basis for finding the claimant "unemployable."

2.  The VA did not state any specific limitations that preclude employment, and cited lack of experience as a factor, which is not relevant to the definition of disability under the Social Security disability program.

3.  The 70% disability is defined by the VA as being appropriate for individuals who demonstrate suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships.  The undersigned finds that there is no evidence of any of these problems, or any similar problems.  The only problem that is even reasonably close to being relevant to the VA assessment is the evidence showing marital strife; as discussed below, the record establishes that this is a cause rather than a symptom of the claimant's distress.

4.  It is noted in the VA decision that the claimant was receiving intensive treatment and his status should therefore be reviewed in two years.  Therefore, the undersigned finds it reasonable to find that improvement was expected by February 2002 and the claimant's disability decreased.  There is no evidence as to the claimant's current VA disability status.

1    For the reasons stated above, the undersigned finds that the VA rating
2    decision is not entitled to any greater weight than it was given by the prior
     Administrative Law Judge, and there is no basis for finding "changed
3    circumstances" or "new and material evidence" exist because of the
     increased weight ordinarily given to such evidence under *McCarthy*,
4    absent the specific reasons for discounting this evidence.

5          Plaintiff first argues that the "ALJ . . . attempted to discount the 2000 V.A.

6    Disability Rating by stating that the claimant was expected to improve by February 2002."

7    Plaintiff contends that this statement is belied by February 2004 test results which show that

8    plaintiff continued to exhibit "serious" symptoms.  This argument is not persuasive because

9    records from 2004 do not show that plaintiff continued to demonstrate serious symptoms.  On

10   January 20, 2004, plaintiff reported to the VA that he had experienced no depression or lack of

11   interest in the past month.  On January 30, 2004, plaintiff told the VA that his mood was better.

12   An assessment also dated January 30, 2004, indicates that plaintiff was assigned a GAF score of

13   50 which, as discussed above, was properly characterized as reflecting moderately serious, not

14   serious, symptoms.  By March 15, 2004, plaintiff reported that regular therapy sessions were

15   extremely helpful.  He also reported the benefits of therapy in a visit on April 21, 2004.  On April

16   23, 2004, plaintiff reported to the VA that he was "handling things well."  By May 19, 2004,

17   plaintiff reported that he was "pretty good."  In August 2004 plaintiff and his therapist

18   determined that plaintiff no longer required therapy sessions to handle his dysthymic disorder.

19   Specifically, the therapist reported:

20         Mr. Dunn appeared euthymic and even cheerful this session, a marked
     change from his presentation during most of his previous sessions.  He
21   seems to be managing his daily life stressors more effectively and coping
     well with his depressive tendencies. . . .
22

23   This sampling of the record shows that, contrary to plaintiff's contention, he was in fact doing

24   much better by 2004.

25   / / /

26   / / /

1       Next, plaintiff contends the ALJ erred by stating that there was no evidence as to

2  plaintiff's current VA disability status.  According to plaintiff, this is factually incorrect as there

3  was hearing testimony on this topic as follows:

4               Q:     Okay.  And going back to the VA in what you are, the
                benefits you're getting now, it's often about 2,500 bucks a month.  Is it for
5               you?

6               A:     Yes.

7  Contrary to plaintiff's argument, this testimony is not evidence of plaintiff's VA disability status.

8  It is merely evidence that plaintiff was receiving VA benefits.  In particular, there is no indication

9  in this testimony as to any particular current VA disability rating.

10      Finally, plaintiff argues that the ALJ ignored a September 2006 VA rating

11 decision which was attached to a letter brief submitted to the ALJ prior to the December 2008

12 administrative hearing.  The attached decision, however, is a September 2006 disability rating for

13 plaintiff's daughter, Katherine Dunn, and not for plaintiff himself.  In any event, even if there is a

14 2006 VA rating as to plaintiff, the court agrees with defendant that such evidence was not

15 relevant to the time period at issue in this case, which ended June 30, 2004.  The record also

16 shows that any mental or emotional difficulties plaintiff may have had during the relevant time

17 period were the result of his decisions regarding the relationship with his wife and not an

18 underlying medical condition.

19

20                                    **V.  CONCLUSION**

21      The time period relevant in this case is March 12, 2002 (the date of the prior

22 decision which gives rise to a continuing presumption of non-disability) and June 30, 2004 (the

23 date plaintiff was last insured for disability benefits).  In order to prevail, plaintiff must show that

24 changed circumstances in this time period rendered his condition worse than it was in March

25 2002.  A chronological review of the record for the relevant time period shows just the opposite.

26 While circumstances certainly changed, they generally changed for the better.

1    Based on the foregoing, the court concludes that the Commissioner's final

2 decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

3 ORDERED that:

4         1.    Plaintiff's motion for summary judgment (Docs. 15 and 16) is denied;

5         2.    Defendant's cross-motion for summary judgment (Doc. 17) is granted; and

6         3.    The Clerk of the Court is directed to enter judgment and close this file.

7

8  DATED:  March 14, 2011

9

10                          _____
                            **CRAIG M. KELLISON**
                            UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

23